## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | |
|---|---|
| ROCKY E. GAUCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:14CV86 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 1383(c)(3) for judicial review of Defendant's final

decision denying Plaintiff's application for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act. For the reasons set forth below, the Court affirms the decision of

the Commissioner.

## I. Procedural History

On January 29, 2011, Plaintiff protectively filed an application for SSI alleging disability

beginning November 18, 2009 due to a hole in his heart, high blood pressure, back pain, shoulder

pain, fatigue, and depression. (Tr. 11, 79, 144-51) The application was denied, and Plaintiff

filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 69-70, 79-83, 87-

88) On March 5, 2013, Plaintiff appeared and testified at a hearing before the ALJ. (Tr. 28-67)

On March 29, 2013, the ALJ determined that Plaintiff had not been under a disability since

January 29, 2011, the date he filed his application. (Tr. 11-23) Plaintiff then filed a request for

review, and on July 21, 2014, the Appeals Council denied Plaintiff's request. (Tr. 1-3) Thus, the

decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing, Plaintiff was represented by counsel. Plaintiff's attorney first requested that Plaintiff undergo an IQ test to determine whether Plaintiff met the listing requirements of 12.05C for deficits of adaptive functioning. Plaintiff testified that he last worked in construction in 2008. He stopped working because he could no longer lift shingles. Plaintiff stated that he had an accident. He was married with two children, ages 23 and 22. Plaintiff weighed 212 pounds and measured 5 feet 9 ½ inches. He had gained weight because he was unable to exercise. Plaintiff lived in an apartment with his wife, who worked taking care of handicapped persons. Plaintiff completed the ninth grade. He attended special education classes in high school. Over the past 15 years, Plaintiff only worked in construction as a carpenter. (Tr. 30-37)

Plaintiff complained of headaches, which he experienced two to three times a month. They lasted about two hours, and Plaintiff would take a pain pill and lay down for two to three hours to relieve the pain. He further testified that his left shoulder sometimes gave out. He experienced shoulder pain when lifting his arm above his head. If he kept his arm elevated too long, his arm went numb. He could lift about 10 pounds with that arm before it began hurting. With regard to Plaintiff's back, he testified that he had constant pain in his lower back since he fell out of tree five years ago. The pain radiated down both legs and caused painful tingling. The pain and tingling went down to his knees about three times a day and lasted for about an hour at a time. Plaintiff sat down until the pain went away. He tried rubbing the cramps for about 20 minutes each time. He also used Icy Hot on his legs. Plaintiff used an Icy Hot patch on his back twice a day. He also took Flexeril and Tramadol, which helped relieve the pain. In addition, Plaintiff's feet swelled once or twice a week. He elevated his feet four times a day, which helped about 50 percent. Plaintiff spent the day sitting in a recliner with his legs elevated.

2

When his feet were swollen, his socks left marks on his feet and ankles, and he experienced tingling. Plaintiff was able to get free or reduced health care because he did not receive Medicaid. (Tr. 37-44)

Plaintiff further testified that was treated by Dr. Gwan-Nulla, who assessed his physical problems and mental health issues. Plaintiff took Zoloft for bipolar disorder. His mental issues caused anger and depression. He felt down about five or six days a week. Two to three days a week, he was in so much pain and felt so depressed that he stayed in bed. He experienced two anxiety attacks in a five-year span. He felt suicidal when he took Cymbalta but did not feel that way currently. (Tr. 44-45)

In addition, Plaintiff stated that he spent about four to six hours in his recliner between the hours of 8:00 AM and 5:00 PM. He lay in bed and took naps about two to three times a week due to pain. Plaintiff previously drank a lot of alcohol but currently only drank about two beers a month. His doctor stated that if Plaintiff did not stop drinking so much he would die. He did not have side effects from his medications. (Tr. 45-47)

Plaintiff testified that he could drive about 30 minutes before needing to stop and stretch until his legs stopped tingling. His wife did the shopping, but he sometimes joined her if she was just grabbing a few things. He could be in the store for about 10 to 15 minutes. Plaintiff was able to do the dishes for about 20 minutes but would then need to sit down for about 20 or 30 minutes. He could sweep the floor with a broom and vacuum for about five minutes each before experiencing tingling and cramping. His wife helped him put on socks about three or four times a week. Plaintiff took showers because he was unable to take a bath. He woke up two to three times a night due to pain. During the day, Plaintiff spent his time sitting around the house and doing what he could. Plaintiff believed he could sit comfortably in a chair for about 45 minutes

3

to an hour about five times during a workday. On a good day, he could stand comfortably for two hours at a time, but on a bad day he could only stand for about an hour before needing to sit or lie down. Plaintiff stated that he could lift 20 pounds at the most. He could squat, bend over, and get up, but not without pain. (Tr. 48-52)

The ALJ questioned Plaintiff about his past work experience. Plaintiff testified that he worked for KB Homes for 15 years cutting vinyl siding. Plaintiff measured and cut at straight and minor angles using a tape measure, pencil, and hand clippers. He stated that he no longer had the strength to perform this work. Plaintiff also worked as a roofer. He brought shingles up a few at a time to the workers on the rooftop. Plaintiff quit that job due to pain. He next worked for a printing company but testified that he could no longer do that work because of the heat and the lifting. (Tr. 52-55)

In addition, Plaintiff testified that he could only walk 200 yards before needing to take a break due to tightness and numbness in his legs and back. However, his doctor recommended that he walk on a daily basis. Plaintiff further stated that he had trouble reading. He took three tries to get his driver's permit the first time because he had difficulty reading the test. The examiner read the test to him, and Plaintiff passed the test on the third try. His wife read the mail because he could not read big words and read at the third grade level. (Tr. 56-59)

A vocational expert ("VE") also testified at the hearing. The VE stated that Plaintiff's past job as a roofer was heavy work and unskilled. His job as a carpenter helper was heavy and unskilled work. Plaintiff had also worked as a manufacturing helper, which was medium, unskilled work. The ALJ then asked the VE to assume an individual that was Plaintiff's age and had the same education and work experience. The hypothetical person could perform the full range of light work but was limited to occasional stooping, as well as simple, routine, and

4

repetitive tasks with no production rate or pace work. The VE testified that the individual could not return to any of Plaintiff's past jobs. However, the person could work as a light cleaner or housekeeper, light laundry worker. The individual could also perform light machine tending jobs. (Tr. 59-63)

The ALJ then reexamined Plaintiff about a prior job at Mike's Construction. Plaintiff stated that he was able to keep pace with some of the jobs but not all when he was in good health. The VE then testified that an employer would not tolerate a worker that was unable to maintain an appropriate pace any more than 10 percent of the working time. In addition, employers only tolerated two unexcused or unscheduled absences a month. (Tr. 63-64)

Plaintiff's attorney also presented a hypothetical to the VE, asking her to assume the first hypothetical with the addition of lifting and carrying less than 10 pounds occasionally and frequently. The VE testified the lifting restriction would eliminate all the jobs she previously mentioned. Further, if standing and/or walking was limited to less than two hours in an eight-hour workday, the light jobs would be eliminated. Assuming the individual could never climb ramps, stairs, ladders, ropes, scaffolds and could never balance, kneel, crouch, crawl, or stoop, the jobs the VE testified to would be removed. Finally, if the person had a first grade reading level, the individual could still perform the light jobs because reading was not part of the jobs. (Tr. 64-65)

At the close of the hearing, the ALJ found no reason to order an IQ test. The ALJ reasoned that the report from Plaintiff's doctor was sufficient. (Tr. 65-66)

In a Function Report – Adult, Plaintiff reported that during the day, his wife put his clothes out and he got dressed when he woke up. He ate breakfast and watched TV. His wife made him lunch around 12:30 PM, after which he walked around the house for exercise. He

5

watched TV until supper and then went to bed. Plaintiff stated that he woke up four or five times a night unable to breathe. His wife helped with his personal care. He sometimes became depressed and did not want to leave his bedroom. Plaintiff did not cook because he would become short of breath and needed to sit down. He did not perform house or yard work. While he could go out alone, he chose not to because he did not want to fall. Plaintiff was able to shop for food, clothes, and personal care items with assistance. He enjoyed watching TV and playing with his grandkids. He spent time with family three days a week, and he attended church on Sundays. He sometimes flipped out and screamed. His conditions affected his ability to lift, squat, bend, stand, reach, walk, kneel, talk, stair climb, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others. Plaintiff believed he could walk 40 feet before needing to sit for 10 to 15 minutes. He was fired from a construction job for trying to throw a co-worker off the roof. He stated that he was angry all the time and was afraid of falling and hurting himself. (Tr. 190-96)

Plaintiff's niece, Jeannie Zumwalt, completed a Function Report Adult – Third Party. She stated that she spent two hours a day with Plaintiff watching TV and talking. Ms. Zumwalt noted that Plaintiff sat around and watched TV all day until dark. He was tired because he was up and down all night. Ms. Zumwalt further stated that she knew Plaintiff was depressed because he wouldn't shave or bathe. His wife reminded him to take his medication. Plaintiff did not cook meals or perform house or yard work. Plaintiff could go out alone but preferred to have someone with him. He shopped for home goods and food with assistance. Ms. Zumwalt also reported that being around a lot of people made him mad, and he did not talk or socialize to many people anymore. His conditions affected his ability to lift, sit, stair climb, understand, squat, bend, follow instructions, stand, reach, complete tasks, get along with others, walk,

6

remember, and concentrate. In addition, he could lift only 10 pounds. He became short of breath when walking and became light headed if he stood too long. He could only walk 20 to 30 feet before needing to rest for 10 minutes. Plaintiff became angry under stress and became depressed frequently. (Tr. 181-88)

Ms. Zumwalt completed a second form indicating that Plaintiff could "absolutely not" work due to his blood pressure, weight, and mental state. She also indicated that Plaintiff experienced pain in his back, legs, shoulder, lungs, and stomach. He was always stressed and needed to have his mail read to him several times. (Tr. 335-36)

Plaintiff's daughter filled out a similar form, stating that her dad's high blood pressure caused him to become very angry and have anxiety attacks. He also had shoulder, back, and stomach pain. She believed that Plaintiff could walk a block or two and stand for 20 minutes before needing to sit or lie down. He could sit for a half hour before needing to stand up or lie down. In addition, she reported that Plaintiff could lift 5 to 10 pounds with one hand and 10 to 20 pounds with both hands. He could not perform household chores. (Tr. 331-33)

## III. Medical Evidence

Records from Community Health Center from November 18, 2009 showed that Plaintiff complained of chest pain, palpitations, and dizziness. He stated that he had a hole in his heart. The examiner assessed hypertension; "hole in heart" (per patient's report); GERD; obesity; and dental disease. The examiner also discussed careful eating and exercising 30 minutes 5 times a week. (Tr. 307-08)

On December 23, 2009, Plaintiff returned to the center for mediation refills. He complained of abdominal pain and low back pain from falling off a ladder 4 years prior. Plaintiff denied chest pain and reported walking on a treadmill. The examiner assessed hypertension;

7

high cholesterol; GERD; and obesity. (Tr. 305-06) On February 2, 2010, Plaintiff reported feeling good. (Tr. 301-02)

He returned to the clinic on February 9, 2010, complaining of severe stomach pain. Plaintiff was sent to the ER for further tests. (Tr. 299-300) Test results showed no acute process in the chest or abdomen, no bowel obstruction, normal appendix, and bilateral fat containing inguinal hernia. Dr. Debra Oden diagnosed nausea and vomiting and sent Plaintiff home in improved condition. (Tr. 250-64) During follow up appointments at the clinic in May and August of 2010, the examiner noted noncompliance and explained the risks of not taking the blood pressure medications. (Tr. 294-97)

Stanley Hudson, Ph. D, completed a Psychiatric Review Technique on March 30, 2011. He determined that Plaintiff had no medically determinable impairment. Dr. Hudson noted that Plaintiff had not reported any symptoms of depression to his treating physician and took no medications for a mental impairment. (Tr. 319-29)

On May 25, 2011, Plaintiff complained of blackouts with coughing, worse since starting Viagra. The examiner assessed hypertension, high cholesterol, and ED. The dosage of Viagra was reduced. (Tr. 380-81) On August 1, 2011, Plaintiff presented with complaints of shortness of breath and mentioned having heat stroke a year ago. The examiner diagnosed acute sinusitis, acute bronchitis, hypertension, and high cholesterol. The examiner also prescribed Cypro and Albuterol and recommended a psychiatric evaluation to assess anger versus bi-polar disorder. (Tr. 377-78)

On February 27, 2012, Plaintiff went to the Hannibal Free Clinic for a blood pressure check and for complaints of anxiety. Plaintiff's hypertension was well-controlled. Meesha Gwan-Nulla, M.D suspected GERD was the cause of Plaintiff's chest pain. In addition, Dr.

8

Gwan-Nulla assessed general anxiety disorder and prescribed Celexa. (Tr. 395-96) Plaintiff complained of headaches on March 26, 2012. Dr. Gwan-Nulla noted spasms over the paravertebral muscles and prescribed Tylenol for the headaches and Flexeril for low back pain. (Tr. 393-94)

Plaintiff presented to the Hannibal Regional Hospital on June 20, 2012, complaining of chest pain. Plaintiff reported left sided chest wall pain and tenderness after helping a friend pick up trash. Pain was reproducible with movement of the left arm, and Plaintiff also experienced pain in the left shoulder with range of motion movement. Plaintiff had no shortness of breath or other complaints. Test results showed no evidence for pulmonary disease or evidence of a left shoulder fracture or dislocation. Dr. Marcus S. Teng assessed chest wall pain and left shoulder sprain and discharged Plaintiff to home in stable condition with orders to follow up with his physician, Dr. Gwan-Nulla. (Tr. 338-351) He visited the Hannibal Free Clinic on June 26, 2012 for a follow up visit. Plaintiff had good range of motion in his left shoulder with some tenderness. Dr. Gwan-Nulla assessed left shoulder strain, ED, hypertension, GERD – stable, and hyperlipidemia. Plaintiff stopped taking Celexa because it bothered his stomach. Plaintiff was advised to return in 4 months. (Tr. 391-92)

On September 24, 2012, Plaintiff complained of anxiety and back pain after traveling. Dr. Gwan-Nulla diagnosed hypertension uncontrolled because Plaintiff was not taking his medication; hyperlipidemia; low back pain, and general anxiety disorder. The doctor prescribed Cymbalta. (Tr. 389-90) When Plaintiff returned on October 29, 2012, he reported doing better with some occasional anxiety. His low back pain was improved. Dr. Gwan-Nulla increased Plaintiff's Cymbalta dosage. (Tr. 387-88) On January 28, 2013, Plaintiff was pleasant and in no

9

apparent distress. Dr. Gwan-Nulla prescribed Ultram for low back pain, discontinued Cymbalta, and prescribed Zoloft. (Tr. 385-86)

On January 14, 2013, Dr. Gwan-Nulla completed a Medical Source Statement of Abilty to do Work-Related Activities (Physical). Dr. Gwan-Nulla opined that Plaintiff could lift/carry less than 10 pounds occasionally and frequently; stand/walk less than 2 hours in an 8-hour workday due to back and leg pain with prolonged standing; and sit for 2 hours before needing to get up. He had no problems with pushing and pulling. In addition, Dr. Gwan-Nulla assessed postural limitations that included never climbing, balancing, kneeling, crouching, crawling, or stooping. Plaintiff had no manipulative, visual/communicative, or environmental limitations. Dr. Gwan-Nulla agreed with Plaintiff's alleged onset date of November 18, 2009 because he fell 21 feet out of a tree five years prior. (Tr. 358-61)

On February 14, 2013, Frank Froman, Ed. D., a clinical psychologist, evaluated Plaintiff at the request of Plaintiff's attorney. Plaintiff reported that he was requesting social security benefits because of increasing back pain stemming from his fall out of a tree. Dr. Froman noted that Plaintiff had no psychiatric history. He no longer drank alcohol or used marijuana. Dr. Froman also noted that Plaintiff's ability to relate and eye contact were fairly good. Plaintiff indicated that he could play with his grandkids but could do little else. He woke up every two hours in pain, but woke up around 5:30 a.m. to take his wife to work. Plaintiff tried to do chores but tired easily. (Tr. 372-73)

Further, Dr. Froman noted that Plaintiff answered all questions slowly and appeared to put forth a best effort. He knew some history and was able to perform some math equations. Dr. Froman estimated that Plaintiff's IQ was in the high 60s. Plaintiff's reading level was "first grade," and he was not able to write. Dr. Froman diagnosed depressive disorder NOS; low

10

intellectual and cognitive abilities with an estimated IQ 70 plus or minus 5; moderately severe stressors including health, finances, mental health, and cognitive abilities; and a GAF of 54. Dr. Froman concluded that based on psychological and not physical factors, Plaintiff could perform very simple one or two step assemblies at a rate of 50% of normal. He could relate adequately to others and understand oral, not written, instructions. Plaintiff was able to withstand the stress of very low levels of simple, conventional employment. However, based on Plaintiff's back problems, Dr. Froman opined that the likelihood of successful work adaptation was extremely unlikely. (Tr. 373-75)

On February 25 and April 29, 2013, Plaintiff returned to the Hannibal Free Clinic for follow up appointments. In February, Dr. Gwan-Nulla noted some spasms of the paravertebral muscles but indicated that Plaintiff's low back pain and depression were improved with medication. He had no complaints in April other than a nodule on his left eyelid, for which Dr. Gwan-Nulla referred Plaintiff to an opthamologist. (Tr. 400-402)

## IV. The ALJ's Determination

In a decision dated March 29, 2013, the ALJ found that Plaintiff had not engaged in substantial gainful employment since January 29, 2011, the application date. His severe impairments included borderline intellectual functioning; chronic back pain; and depression. However, he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically assessed Plaintiff's impairments in light of 12.04, affective disorders, and 12.05C, mental retardation. The ALJ found mild restriction in activities of daily living and social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. Because Plaintiff did not have at least two marked limitations or one marked

11

limitation and repeated episodes of decompensation, his impairment did not satisfy paragraph B criteria. Likewise, paragraph C was not satisfied because Plaintiff could not establish repeated episodes of decompensation, propensity toward decompensation, or a need for a highly supportive living arrangement. (Tr. 11-15)

With regard to mental retardation, the ALJ noted that Plaintiff did not present evidence of dependence on others for personal needs and an inability to follow directions to satisfy paragraph A. In addition, paragraph B was not satisfied because Plaintiff did not have a full scale IQ of 59 or below. Further, he did not have a valid IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitations of function. The ALJ found Dr. Froman's estimation of an IQ of 70 plus or minus 5 to be valid. (Tr. 15-16)

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work except for occasional stooping; simple routine repetitive tasks; and no production rate or pace work. The ALJ reiterated that Plaintiff did not meet the criteria of 12.05C for mental retardation, noting that the school records showed poor grades but not special education, which did not support an allegation of adaptive functioning prior to age 22. After careful consideration of the evidence, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, Plaintiff's statements regarding the intensity, persistence, and limiting effects were not entirely credible. For instance, the record showed little treatment for musculoskeletal complaints. In addition, he did not receive mental health outpatient treatment, and psychiatric system evaluations were benign. The ALJ found that Plaintiff's description of his symptoms and limitations were not supported by evidence in the record. (Tr. 16-19)

12

The ALJ gave great weight to Dr. Froman's opinion because it was well-supported and consistent with the record as a whole. However, he accorded little weight to the State Agency psychologist and the opinion of Dr. Gwan-Nulla. The ALJ reasoned that Dr. Gwan-Nulla failed to support the opinion with medical records or treatment notes. The ALJ further found the third-party reports to be inconsistent with the record and not well-supported by the evidence. While the RFC supported an ability to work, the ALJ found Plaintiff unable to perform any past relevant work. In light of his younger age, limited education, work experience, and RFC, the ALJ determined that Plaintiff could perform jobs that exist in significant numbers in the national economy. The ALJ relied on the VE's testimony to find that Plaintiff could work as a light cleaner, laundry worker, and machine tender. As such, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, since January 29, 2011, the date he filed his application. (Tr. 19-22)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R.,

13

Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir.2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and

14

set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski[1]* factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In his Brief in Support of the Complaint, Plaintiff raises three claims. First, Plaintiff argues that the ALJ committed reversible error in not giving controlling weight to the opinion of Plaintiff's treating physician, Dr. Gwan-Nulla. Next, Plaintiff asserts that the ALJ committed reversible error in finding that Plaintiff's mental impairments did not meet a listing under 12.05C. Finally, Plaintiff contends that the ALJ's boilerplate credibility determination was clearly patently erroneous.

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

## A. Dr. Gwan-Nulla

Plaintiff argues that the Medical Source Statement ("MSS") completed by Dr. Gwan-Nulla, Plaintiff's treating physician, was entitled to controlling weight. Specifically, Plaintiff asserts that, contrary to the ALJ's determination, the medical records and the Plaintiff's testimony support the MMS such that the ALJ should have given controlling weight to the limitations set forth by Dr. Gwan-Nulla.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

In this case, the ALJ properly found that the opinions offered by Dr. Gwan-Nulla in her MSS were inconsistent with the medical evidence and with her own treatment notes. Therefore,

the ALJ gave the opinions little weight. (Tr. 20) The record shows that Dr. Gwan-Nulla only examined Plaintiff every few months over a span of a year and two months. (Tr. 385-402) Dr. Gwan-Nulla primarily monitored Plaintiff's medications and mentioned no work restrictions or activity limitations. *See Choate v. Barnhart*, 457 F.3d 865, 870-71 (8th Cir. 2006) (finding that ALJ properly discredited physician's Medical Source Statement where treatment notes never mentioned restrictions or limitations to the plaintiff's activities). Indeed, during several appointments, Plaintiff either indicated that his pain and mood were improved, or he did not complain of back pain or anxiousness at all.

As previously stated, the ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz*, 182 F. App'x at 626. Additionally, the ALJ may properly give little weight to an opinion that consists of vague, conclusory statements or is merely a checklist with no elaboration. *Swarnes*, 2009 WL 454930, at *11; *Wildman*, 596 F.3d at 964. Because Dr. Gwan-Nulla's MSS contained limitations far more severe than indicated in the treatment record and failed to include any medical evidence or explanation, other than Plaintiff's subjective statement about falling out of a tree, the ALJ properly gave the opinion little weight. *Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (discounting treating physicians' opinions where the form cited no clinical test results, treatment notes did not report significant limitations due to back pain, and the opinions were based on plaintiff's subjective complaints).

## B. Listing 12.05C

Plaintiff next contends that the ALJ erred in finding that Plaintiff's mental impairments did not meet the requirements of Listing 12.05C, which requires a plaintiff to establish "(1) a valid verbal, performance, or full scale IQ score of 60 through 70; (2) an onset of the impairment

17

before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006). Further, "Listing 12.05 states, 'Intellectual disability refers to significantly subaverage general functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.'" *Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) (quoting 20 C.F.R. Pt. 404, subpt. P, app. 1 § 12.05). The burden is on the plaintiff to demonstrate that his impairment matches all the specified criteria of a listing. *McDade v. Astrue*, 720 F.3d 994, 1001 (8th Cir. 2013).

Here, after administering several tests, Dr. Froman estimated Plaintiff's IQ to be in the high 60's, specifically 70 plus or minus 5. The ALJ gave great weight to Dr. Froman's opinion and found this score sufficient to determine whether Plaintiff met the Listing. Indeed, the ALJ assessed the Listing requirements assuming that Plaintiff's IQ was in the upper 60s. (Tr. 20) However, the ALJ found that Plaintiff did not meet Listing 12.05C for mental retardation because he failed to establish that he possessed deficits in adaptive functioning prior to age 22.

Plaintiff argues that the fact he dropped out of high school in the middle of 10th grade, had poor grades, was unable to read, and failed his driver's test twice is sufficient evidence that his deficits in adaptive functioning manifested themselves before age 22. Plaintiff also asserts, without supporting evidence, that he attended special education classes. The ALJ acknowledged these facts when determining whether Plaintiff met the Listing criteria. The ALJ noted, however, that Plaintiff testified he could read small words and stopped working because he could no longer lift heavy shingles, not because he was unable to understand or follow instructions. (Tr. 18) Further, the ALJ found that Plaintiff worked successfully for many years, indicating an ability to learn work tasks, follow directions, and stay on tasks in jobs after high school. In

18

addition, while he testified that someone read the driver's test to him on his third try so he could pass, Plaintiff did not report difficulty taking the test when examined by Dr. Froman.

Contrary to Plaintiff's assertion, evidence of poor grades or special education classes does not compel a finding that a plaintiff suffered deficits in adaptive functioning. *Cheatum v. Astrue*, 388 Fed. App'x 574, 576 (8th Cir. 2010). Instead, the ALJ may rely on evidence that a plaintiff was able to maintain employment for many years, as well as perform activities of daily living to conclude that a plaintiff does not meet that requirement of the Listing. *Id.* at 576-77; *see also Miles v Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (ALJ could rely on fact that plaintiff attended regular high school classes, received grades of B, passed a driver's license examination, drove a car, lived independently, and had not been terminated from a job due to lack of mental ability to discredit plaintiff's claim of mental retardation). Here, the ALJ correctly noted that Plaintiff was able to shop occasionally, perform some household chores, take care of most of his personal hygiene, watch TV, walk around the house for exercise, and play with his grandkids. (Tr. 14-15) He could pay bills and count change, and he had his driver's license and a car. (Tr. 15, 18) Thus, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff did not demonstrate deficits in adaptive functioning prior to age 22. *Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998) (finding substantial evidence supported the Commissioner's decision that plaintiff did not meet Listing 12.05C where she was not restricted in her daily activities due to any mental impairment, and plaintiff could read, write, count money, drive, perform household chores, shop, and take care of her daughter).

## C. Plaintiff's Credibility

Last, Plaintiff argues that "the ALJ's boilerplate credibility determination is clearly patently erroneous." Plaintiff contends that the ALJ should have found his subjective complaints

19

of physical pain and restrictions credible. Specifically, Plaintiff asserts that the ALJ failed to cite specific reasons for the credibility finding and failed to properly consider the observations by third parties as required by Social Security Regulation ("SSR") 96-7p.

SSR 96-7p provides that when making credibility determinations with respect to a claimant's statements, the ALJ must "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." The ALJ may not discredit the statements solely because they are unsubstantiated by objective medical evidence, and the ALJ's decision must give specific reasons for the credibility findings. SSR 96-7p; *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009) ("an ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them."). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart,* 354 F.3d 710, 714 (8th Cir.2003).

Here, contrary to Plaintiff's argument, the ALJ explicitly cited specific reasons for discounting Plaintiff's credibility. First, the ALJ noted the lack of objective medical evidence supporting Plaintiff's musculoskeletal complaints, along with the limited and conservative treatment he received. (Tr. 19-20) The ALJ may rely on a conservative course of treatment to discredit Plaintiff's allegations. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). Further, Plaintiff's symptoms were well controlled with medication. (Tr. 13-14) Where symptoms improve with treatment, the ALJ may find a plaintiff's allegations of disabling pain not credible. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012). The ALJ also noted that Plaintiff's

20

daily activities which included occasionally shopping, performing light household chores, watching TV, walking around the house, and playing with his grandchildren. (Tr. 14-15) He was able to socialize with family and attend church regularly, and he could drive and pay bills. (Tr. 15) These activities are inconsistent with claims of disability. *See Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) (finding plaintiff's activity level undermined her allegations of total disability where she performed light housework, washed dishes, could handle money, shopped, watched TV, drove a vehicle, regularly attended church, and visited with her family).

Plaintiff takes particular issue with the ALJ's consideration of third-party reports. Plaintiff argues that the ALJ should have accorded more weight to the statements by Plaintiff's wife, daughter, and niece because they were consistent with Plaintiff's testimony and the medical evidence. However, the record shows that the ALJ thoroughly considered all of these statements. (Tr. 20-21) Although SSR 96–7p mandates that an ALJ consider the testimony of "other persons," an ALJ is free to reject cumulative testimony of lay persons where the ALJ properly discredits the plaintiff's complaints of disabling pain. *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir.1998). Here, Plaintiff's family members were not qualified to give an opinion regarding Plaintiff's ability to work, and the third-party reports merely corroborated Plaintiff's testimony regarding his activities and symptoms. Indeed, the ALJ explicitly found that the family members were not acceptable medical sources and that their opinions were inconsistent with the record and not supported by the evidence. *See Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (finding the ALJ properly refused to give controlling weight to testimony by plaintiff's mother, sister, and husband because they were not qualified to render an opinion regarding plaintiff's capacity to work, the statements merely corroborated plaintiff's testimony, and the testimony conflicted with the medical evidence). As such, the Court finds that substantial evidence

21

supports the ALJ's credibility determination, and the Court will affirm the final decision of Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __8th__ day of September, 2015.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**